**UNITED STATES of America, Plaintiff,**

v.

**William Daniel NELSON, Diana G. Nelson, Harvey Curry, Burlon Davis, James Moss, Damon Joe Nelson, and Dana Nelson, Defendants.**

**Cr. A. No. 89–20081–01.**

United States District Court, D. Kansas.

May 25, 1990.

Leon J. Patton, Asst. U.S. Atty., Kansas City, Kan., for plaintiff.

Vernon E. Lewis, Michael Harris, Asst. Federal Public Defender, Carl E. Cornwell, Thomas Boeding, Robert DeCoursey, Paul Dent, Kansas City, Kan., and Michael J. Waite, Leavenworth, Kan., for defendants.

## SENTENCING MEMORANDUM

EARL E. O'CONNOR, Chief Judge.

In October of 1989, defendants were charged in an indictment with a series of drug offenses, including conspiring to possess with intent to distribute cocaine base. After a three-week trial, a jury found the defendants guilty of committing and conspiring to commit certain drug offenses.

The court thereafter ordered the United States Probation Office to prepare and file a presentence investigation report on each of the defendants.

The parties objected to United States Probation Office recommendations contained in the presentence reports and filed presentence submissions with respect to the following sentencing factors and guideline computations: the quantity of drugs used to determine the base offense level, a two-level increase in offense level for the possession of a weapon, a two-level increase in offense level for restraint of a victim, a two-level increase in offense level for obstruction of justice, and various adjustments made for the respective defendants' roles in the offense. Defendant Burlon Davis additionally challenges the constitutionality of the Guidelines. Evidentiary hearings were held on the 5th, 6th and 10th days of April, 1990, with regard to the relevant sentencing factors which had been questioned by the parties. Oral findings were made and the defendants were sentenced on April 10 and April 11, 1990, pursuant to the United States Sentencing Commission Guidelines, *see* 18 U.S.C. §§ 3551 *et seq.* (Supp. V 1989) and 28 U.S.C. §§ 991–98 (Supp. V 1989) (hereinafter "Guidelines"). This sentencing memorandum shall memorialize, and to some extent supplement, those findings and sentences.

## I. THE SENTENCING RECORD

In resolving the disputes about sentencing determinations, the court may consider "relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3. The Commentary to Guideline § 6A1.3 notes that reliable hearsay evidence may be considered by the sentencing judge. *See, e.g., United States v. Cuellar–Flores,* 891 F.2d 92, 93 (5th Cir.1989) (use of hearsay statements made to probation officer by law enforcement official investigating defendant's case).

As to all of the defendants, except Diana Nelson, the court has reviewed records and testimony at an evidentiary hearing on the 5th and 6th days of April, 1990, in making its findings on disputed facts and applying the Sentencing Guidelines. More specifically, the court heard the testimony of United States Probation Officers William Martin and Clarence Wiedel, as well as ATF Agent James Carlson. Agent Carlson's testimony included the hearsay statements of Melissa Bolton, Debbie Crain, Jermiah Cramer, Michael Dale, Ed Mallory, Terresa Maupins, Jerry Mays, Cindy McKeon, Robert Nelson, Cornetta Newton, Gerry Smith, Michael Strathman, Kimberly Turner, Michael Wilson, Harold Sutton, and Twila Gatewood. The court read the trial transcript of the testimony of Eddie Russell and Michael Strathman. The court also considered trial exhibits 1, 2, 57, and 400.

The court considered the testimony of the same three witnesses—Martin, Wiedel, and Carlson—with regard to the sentencing of Diana Nelson on April 10, 1990. Testimony of Probation Officer Wiedel related hearsay statements of Kimilie Grazier, Eva Ridens, and Diana Nelson. Agent Carlson's testimony included the hearsay statements of Special Agent Rhonda Trahern, defense counsel Vernon Lewis, Melissa Bolton, Eddie Russell, Michael Strathman, Cornetta Newton, Jermiah Cramer, Jerry Mays, Gary Smith, William Nelson, Jr., Douglas Brantley, Debbie Crain, Kimberly Turner, Robert Nelson, Denise Davis, and Kimilie Grazier. In addition, the court read the September 12, 1989, affidavit of Robert Nelson, and a letter, marked exhibit 400, purportedly from William Nelson, Sr., to Diana Nelson. The court also read the transcripts of the grand jury testimony of the following witnesses: Diana Nelson, Dana Nelson, Robert Nelson, Jermiah Cramer, Edward Mayes, Terresa Maupins, Debbie Crane, and Toni Shuster.

■ The court, on its own initiative, has reviewed all of its trial notes and has used that testimony as a basis for the court's findings on disputed facts and factors in determining the appropriate sentencing guidelines as to all defendants. The court finds that the hearsay statements and otherwise inadmissible testimony at the evidentiary hearings are sufficiently corroborated by the facts as otherwise developed at the trial and other evidence before the court to give sufficient indicia of reliability to support their probable accuracy. Therefore, such evidence is admitted and has been utilized for sentencing purposes.

## II. CONSTITUTIONALITY OF THE GUIDELINES

### A. *Delegation of Legislative Authority and Separation of Powers*

■ Defendant Burlon Davis challenges the constitutionality of the Sentencing Reform Act of 1984, as amended (hereinafter "Act"), 18 U.S.C. § 3551 *et seq.* (Supp. V 1989), and 28 U.S.C. §§ 991–98 (Supp. V 1989), and the Guidelines promulgated thereunder, on grounds that they violate the separation-of-powers doctrine. We assume the defendant challenges the Act and Guidelines on separation-of-powers grounds because they place the Sentencing Commission in the judicial branch, require federal judges to serve on the Commission and share their authority with nonjudges, and empower the President to appoint Commission members and remove them for cause. *See* 28 U.S.C. § 991(a). Davis also argues that the Act provides for an unconstitutional delegation of legislative authority.

In January of 1989, the Supreme Court upheld the constitutionality of the Act and the guidelines against challenges on the same grounds asserted here. *Mistretta v. United States*, 488 U.S. 361, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989). The Court admittedly stated that the Sentencing Commission is "an unusual hybrid in structure and authority," but concluded that in creating the Commission:

Congress neither delegated excessive legislative power nor upset the constitutionally mandated balance of powers among the coordinate Branches. The constitution's structural protections do not prohibit Congress from delegating to an expert body located within the Judi-

cial Branch the intricate task of formulating sentencing guidelines consistent with such significant statutory direction as is present here. Nor does our system of checked and balanced authority prohibit Congress from calling upon the accumulated wisdom and experience of the Judicial Branch in creating policy on a matter uniquely within the ken of judges. *Id.* 109 S.Ct. at 675. Accordingly, we hold that the Act and the Guidelines promulgated thereunder do not delegate excessive legislative power or violate the separation-of-powers principle.

### B. *Due Process Challenge to Guidelines*

■ Davis also argues that the Guidelines eliminate the court's sentencing discretion and therefore are unconstitutional because they deny due process.[1] The Tenth Circuit recently held that Congress "may circumscribe the court's sentencing discretion through the Guidelines" because the legislative branch "has the power to completely divest the courts of their sentencing discretion to establish exact, mandatory sentences for all offenses." *United States v. Thomas,* 884 F.2d 540, 543 (10th Cir.1989). The court added that the statutory scheme created by the Act "permits departure in a proper case, and has not withdrawn all discretion from the sentenc-

ing court."[2] *Id.* at 542–43. We conclude that Davis' due process argument is without merit.

### C. *Constitutionality of Guideline § 3C1.1*

■ Application Note 3 of the Commentary to § 3C1.1 relating to obstruction of justice states that "this section of the Guidelines is not intended to punish a defendant for the exercise of a constitutional right. A defendant's denial of guilt is not a basis for application of this provision."[3] Defendant Davis contends that § 3C1.1 is unconstitutional because it "impedes his right to testify in his own defense." The Tenth Circuit recently rejected an appellant's argument that he should not receive an upward adjustment for obstruction of justice because § 3C1.1 "is unconstitutional in violation of ... his right to testify." *See United States v. Beaulieu,* 900 F.2d 1537, 1538 (10th Cir.1990). Other circuits have found similar arguments like Davis' to be unpersuasive.[4] We likewise are not favorably impressed and hold that § 3C1.1 is constitutional.

### III. STANDARD OF PROOF

■ Nothing in the Guidelines suggests that the Commission intended to require trial judges to articulate any particular

---

1. Every circuit court addressing due process challenges to the Sentencing Guidelines has refused to find a violation. *See United States v. Thomas,* 884 F.2d 540 (10th Cir.1989); *United States v. Bolding,* 876 F.2d 21 (4th Cir.1989); *United States v. Pinto,* 875 F.2d 143 (7th Cir.1989); *United States v. Allen,* 873 F.2d 963 (6th Cir.1989); *United States v. Seluk,* 873 F.2d 15 (1st Cir.1989); *United States v. Brittman,* 872 F.2d 827 (8th Cir.1989); *United States v. White,* 869 F.2d 822 (5th Cir.) (per curiam), *cert. denied,* — U.S. —, 109 S.Ct. 3172, 104 L.Ed.2d 1033 (1989); *United States v. Vizcaino,* 870 F.2d 52 (2d Cir.1989); *United States v. Frank,* 864 F.2d 992 (3d Cir.1988), *cert. denied,* — U.S. —, 109 S.Ct. 2442, 104 L.Ed.2d 998 (1989).

2. Under the Guidelines, sentencing judges "'retain discretion to accept or reject a plea bargain, to resolve factual disputes about the appropriate base offense level, to consider adjusting that base level for mitigating and aggravating circumstances, to choose from a range of sentences, to set probation conditions, and to determine when to depart from the Guidelines.'"

*United States v. Thomas,* 884 F.2d at 543 (quoting *United States v. Brittman,* 872 F.2d 827, 828 (8th Cir.1989)).

3. We note, however, that the giving or subornation of perjurious testimony is not the exercise of a constitutional right. *United States v. Keys,* 899 F.2d 983 (10th Cir.1990). As the Supreme Court observed in *United States v. Grayson,* 438 U.S. 41, 54, 98 S.Ct. 2610, 2617, 57 L.Ed.2d 582 (1978), "[t]here is no protected right to commit perjury."

4. *See, e.g. United States v. Wagner,* 884 F.2d 1090, 1098 (8th Cir.1989) (rejecting argument that adjustment for testifying untruthfully violated defendant's constitutional right to testify); *United States v. Acosta–Cazares,* 878 F.2d 945, 953 (6th Cir.), *cert. denied,* — U.S. —, 110 S.Ct. 255, 107 L.Ed.2d 204 (1989) (defendant's right to testify is not violated by application of § 3C1.1 where sentencing judge believes defendant attempted to obstruct justice by lying during his testimony).

standard of proof when finding facts in sentencing proceedings. Case law clearly establishes, however, that the parties need not prove the facts used for sentencing "beyond a reasonable doubt."[5] The Supreme Court has held that the "preponderance standard satisfies due process." *McMillan v. Pennsylvania,* 477 U.S. 79, 91, 106 S.Ct. 2411, 2419, 91 L.Ed.2d 67 (1986) (noting that sentencing courts have "traditionally heard evidence and found facts without any prescribed burden of proof at all"). Accordingly, this court will employ the "preponderance of evidence" standard of proof when finding facts in sentencing proceedings.

## IV. APPLICATION OF THE GUIDELINES

### A. *Quantity of Controlled Substance*

■ Defendants object to the quantity of drugs used to determine their base offense levels.[6] In the case of criminal activity undertaken in concert with others, the government is not required to establish that a defendant individually possessed the amount of controlled substance used to calculate his or her offense level. A defendant is accountable for the reasonably foreseeable conduct of others when such conduct was in furtherance of the execution of a jointly-undertaken criminal activity. Application Note 1 of the Commentary to

§ 1B1.3.[7] In determining the appropriate offense level, the background notes to § 1B1.3 reveal that quantities of drugs not specified in the count of conviction are to be included if the drugs were part of the same common scheme or plan as the count of conviction.[8]

■ In the case at bar, approximately 67 grams of cocaine base were actually recovered by law enforcement authorities as a result of seizures after the execution of search warrants and the controlled purchases. Defendants argue that the amounts of contraband seized, together with the drugs obtained from the underlying controlled purchases, adequately reveal the scale and the extent of their criminal enterprise. We strongly disagree. Each of the raids in which drugs were seized occurred on a Tuesday or Thursday. Witnesses and one codefendant reported that the greatest volume of sales occurred on weekends. Witnesses also testified that cocaine base was for sale twenty-four hours per day, seven days a week. Several witnesses stated that a large quantity of the crack was "stashed" outside the Nelsons' houses after the first raid. It follows that the cocaine base seized in subsequent raids did not reflect the amount available for sale or actually sold.

■ We are convinced that the amount of cocaine base seized or sold through con-

---

**5.** *See, e.g. Patterson v. New York,* 432 U.S. 197, 214, 97 S.Ct. 2319, 2329, 53 L.Ed.2d 281 (1977) (rejecting beyond reasonable doubt standard of proof); *United States v. Gooden,* 892 F.2d 725, 727–28 (8th Cir.1989) (adopting preponderance standard); *United States v. Ehret,* 885 F.2d 441, 444 (8th Cir.1989) (adopting preponderance standard) *United States v. Wright,* 873 F.2d 437, 441–42 (1st Cir.1989) (adopting preponderance standard); *United States v. Lee,* 818 F.2d 1052, 1057 (2d Cir.) (pre-Guidelines case adopting preponderance standard), *cert. denied,* 484 U.S. 956, 108 S.Ct. 350, 98 L.Ed.2d 376 (1987).

**6.** The United States Probation Office recommends that the court use a quantity of at least 500 grams of cocaine base to determine defendants' base offense level. A base offense level of 36 would be applied if the court were to approximate the quantity of controlled substance involved in the jointly-undertaken enterprise to be 500 grams.

**7.** Guideline § 1B1.3(a)(1) states that all acts and omissions committed or aided and abetted by the defendant, for which the defendant *would otherwise be accountable,* that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense, or that otherwise were in furtherance of that offense may be used to calculate the offense level.

**8.** Guideline § 3D1.2(d) states that multiple counts are to be grouped together if the offense level is determined largely on the basis of a substance involved. In the instant case, the base offense level was determined on the basis of the substance involved. In determining the offense level under these circumstances, the application of subsection § 1B1.3(a)(2), which provides for the use of all acts that were part of the common scheme, is not dependent upon whether multiple counts were alleged. Background Note of Commentary to § 1B1.3.

trolled buys on any particular day did not reflect the sales for that entire day. Since the amount of drugs seized or so sold does not reflect the scale of defendants' offenses, the court must approximate the amount of the controlled substance involved. Application Note 2 of the Commentary to § 2D1.4.[9] In estimating the quantity of controlled substance, we may consider the price generally obtained for the drugs, financial records, and similar transactions in controlled substances by the defendants. *Id.*

■ Michael Strathman, a close friend of the Nelson family who sold "crack" for them, testified that by late November of 1988 the defendants were selling an average of approximately thirty "$30 rocks" each day. One of the codefendants who pled guilty corroborated Strathman's estimate. The average weight of the cocaine base rocks seized or purchased was 0.2 grams. Bolton, Newton, and Mays testified that at least 25 such rocks were sold on a typical day. Crain, a witness who was closely involved with the Nelsons in mid–1989, stated that she was present when large cash proceeds were counted. The proceeds often amounted to several thousand dollars.

The amount of cocaine base seized after execution of search warrants is also in-

formative in determining the overall quantity of controlled substance. On February 7, 1989, law enforcement authorities discovered 60 grams of crack, $9,692 in cash (equivalent of 64.6 grams sold in $30 rocks), and a note reflecting credit sales totaling approximately $4,450 (equivalent to 29.6 grams). On August 10, 1989, 4.0 grams were recovered. Five days later, two rocks weighing 0.3 grams were purchased and fifteen rocks weighing three grams were seized in a raid. Thus, the smallest amount bought and/or seized in any single day was 3.3 grams. Even if we were to assume that the defendants' daily sales averaged only three grams, the equivalent of 15 rocks, and that the conspiracy was only in operation from February 1 to August 15, 1989 (rather than beginning in November 1988, as reported by Strathman), the total would easily exceed 500 grams. The court will therefore use the quantity of 500 grams of cocaine base to determine defendants' base offense level.[10]

### B. *Possession of a Weapon*

All seven defendants object to a two-level enhancement for possession of a weapon. The base offense level of defendants whose offenses involve drugs is to be increased two levels if a dangerous weapon was possessed during the commission of the of-

**9.** *See also United States v. Gerante,* 891 F.2d 364, 369 (1st Cir.1989) (district court had authority to treat cash discovered in defendant's residence as equivalent to estimated quantity of cocaine for purposes of calculating base offense level); *United States v. Garcia,* 889 F.2d 1454, 1456 (5th Cir.1989) (district court could consider cocaine which defendant negotiated to deliver but had been unable to procure for delivery to undercover agent); *United States v. Gohagen,* 886 F.2d 1041, 1043 (8th Cir.1989) (evidence supported inclusion of estimated weight of cocaine not seized for purposes of determining base offense level); *United States v. Sarasti,* 869 F.2d 805, 806 (5th Cir.1989) (quantity of drugs not specified in count of conviction may be considered by sentencing judge if adequate evidentiary basis exists for determining amount seized does not reflect scale of offense); *United States v. Phillips,* 730 F.Supp. 45, 47 (N.D.Tex.1990) (sentencing judge is required to approximate quantity of controlled substance where drugs seized do not reflect scale of offense).

**10.** Defendants argue that 21 U.S.C. § 841 does not authorize an enhanced sentence in the in-

stant case because the statute does not define the analytical difference between cocaine and the term "cocaine base," commonly referred to as "crack." From the very beginning of this case, the controlled substance involved was referred to as crack or cocaine base. Special Agent Carlson referred to "crack/cocaine" in his affidavit accompanying the arrest warrants and criminal complaints. The United States Attorney's Office identified the controlled substance as "cocaine base ('crack')" in the information it filed on October 5, 1989. The evidence at the hearings and at trial related primarily to the possession and distribution of crack cocaine. The court employed the term "cocaine base" when the jury was instructed and that is the substance that the jury so found defendants possessed and sold in returning its verdicts of guilty. We therefore reject defendants' argument that they cannot receive an enhancement pursuant to § 841 because that provision does not make a distinction between cocaine and cocaine base.

fense. U.S.S.G. § 2D1.1(b)(1).[11] There is no question that weapons were present in the Neconi and Insley street residences. The defendants, however, argue that there is no evidence in the record to indicate that they exerted dominion or control over any weapons.

The base offense level of a defendant who participates in a jointly-undertaken criminal activity may be increased by two levels even if that defendant did not actually possess a weapon. Conduct relevant for determination of the applicable guideline range consists of "all acts and omissions committed or aided and abetted by the defendant, *or for which the defendant would be otherwise accountable.*" U.S.S.G. § 1B1.3 (emphasis added). When the defendant undertakes criminal activity in concert with others, the conduct for which he or she "would otherwise be accountable" includes conduct of the other participants which was in furtherance of the jointly-undertaken activity and reasonably foreseeable by the defendant. App. n. 1 of Commentary to § 1B1.3.[12]

An additional key to determining whether the enhancement for weapon possession should be applied is found in Application Note 3 of the Commentary to § 2D1.1:

> The enhancement for weapons possession reflects the increased danger of violence when drug traffickers possess weapons. The adjustment should be applied if the weapon was present, *unless it is clearly improbable that the weapon was connected with the offense.* For example, the enhancement would not be applied if the defendant, arrested at his residence, had an unloaded hunting rifle in his closet. The enhancement also applies to offenses that reference § 2D1.1, *i.e.,* §§ 2D1.2, 2D1.4 ...

U.S.S.G. § 2D1.1, Application n. 3 (emphasis added).[13] Thus, the issues reduce themselves to whether it was "clearly improbable" that any weapons were connected to the conspiracy and whether the use of any such weapons by at least several of the defendants was reasonably foreseeable to the remaining participants of the conspiracy.

**11.** Several courts of appeals have recently applied this sentence enhancement to a variety of factual circumstances. *See United States v. Mocciola,* 891 F.2d 13, 16–17 (1st Cir.1989) (three weapons in bedroom where 291 grams of cocaine were seized); *United States v. Green,* 889 F.2d 187, 188–89 (8th Cir.1989) (handgun discovered in different room of residence in which cocaine base was found); *United States v. Paulino,* 887 F.2d 358, 360 (1st Cir.1989) (pistol in bedroom bureau drawer with proceeds of heroin sale); *United States v. Gillock,* 886 F.2d 220, 222–23 (9th Cir.1989) (weapons and drugs seized from same closet); *United States v. Restrepo,* 884 F.2d 1294, 1296–97 (9th Cir.1989) (automatic pistol found in mattress of home where drugs were seized); *United States v. Holland,* 884 F.2d 354, 358–59 (8th Cir.1989) (two pistols found in defendant's residence where amphetamines seized); *United States v. Koonce,* 884 F.2d 349, 353–54 (8th Cir.1989) (large number of firearms found at residence in which drugs were seized); *United States v. McGhee,* 882 F.2d 1095, 1096 (6th Cir.1989) (rifles and handguns concealed in secret compartment of walls where cocaine seized); *United States v. Hewin,* 877 F.2d 3, 4 (5th Cir.1989) (pistol found on backseat of car where marijuana was seized in trunk); *United States v. White,* 875 F.2d 427, 433 (4th Cir.1989) (loaded pistol under driver's seat of car where drugs were seized from pas-

senger); *United States v. Jones,* 875 F.2d 674, 675–76 (8th Cir.) *cert. denied,* — U.S. —, 110 S.Ct. 177, 107 L.Ed.2d 133 (1989) (per curiam) (gun found in close proximity to drugs seized). Two of the above circuit courts have ruled that § 2D1.1(b)(1) passes constitutional muster. *See United States v. Restrepo,* 884 F.2d at 1296–97 (no due process violation where commentary creates an exception rather than presumption that connection exists); *United States v. McGhee,* 882 F.2d at 1097–99 (no due process violation where burden placed on defendant to show connection between firearm and offense was "clearly improbable").

**12.** *See United States v. White,* 875 F.2d 427, 433 (4th Cir.1989) (upholding enhancement of defendant's offense level for firearm discovered under codefendant's car seat because both were acting in concert, codefendant's possession of firearm was reasonably foreseeable to defendant, and not improbable that weapon was connected with offense).

**13.** Commentary to a guideline section "may interpret the guideline or explain how it is to be applied." U.S.S.G. § 1B1.7 We may "treat the commentary much like legislative history or legal material that helps determine the intent of a drafter." Commentary to U.S.S.G. § 1B1.7.

Diana Nelson confirmed that at least one weapon was traded for cocaine during the course of the drug trafficking conspiracy. She also indicated that someone had purchased a firearm for her. Six firearms were seized from the Nelson households pursuant to the execution of search warrants on February 7, 1989. Grand jury testimony indicates that firearms were often present or possessed by one or more of the defendants during drug transactions. One witness testified to the grand jury that all of the drug dealers had guns. During trial, Michael Strathman stated that William Nelson, Sr., gave him a Derringer pistol for "protection." Given these facts, we have no difficulty concluding that it is not "clearly improbable" that the aforementioned firearms were connected to the instant offense and that use of such weapons by at least several of the participants was reasonably foreseeable to the remaining defendants who engaged in the jointly-undertaken criminal activity.

### C. *Restraint of Victim*

■ The presentence report of four co-defendants recommends a two-level enhancement under Guideline § 3A1.3 for their participation in the abduction and beating of Harold Sutton (hereinafter "Sutton"). Section 3A1.3 states that a defendant is to receive a two-level increase if "the victim of a crime was physically restrained in the course of the offense." [14] Application Note 1(b), (i) of the Commenta-

ry to Guideline § 1B1.1 states that the term "physically restrained" means "the forcible restraint of the victim such as being tied, bound, or locked up." [15] By use of the words "such as," the Sentencing Commission listed "being tied, bound, or locked up" by way of example rather than limitation. *United States v. Stokley*, 881 F.2d 114, 116 (4th Cir.1989).

While the court finds that Harold Sutton was abducted and beaten by Michael Wilson, Burlon Davis, Damon Nelson, and James Moss at the direction of William Nelson, Sr.,[16] we are unable to find by a preponderance of the evidence that this incident was drug-related. It is just as probable that Sutton was kidnapped and attacked over a dispute involving the attentions of Toni Shuster. Accordingly, we decline to assess the defendants Davis, Moss, Damon Nelson or William Nelson, Sr., a two-level enhancement for restraint of a victim pursuant to § 3A1.3 of the Sentencing Guidelines.

### D. *Obstruction of Justice*

■ The next issue presented concerns the propriety of enhancing the sentences of William Nelson, Sr., Diana Nelson, Dana Nelson, and Burlon Davis under Guideline § 3C1.1 for obstruction of justice. The base offense level of a defendant who has "impeded or obstructed, or attempted to impede or obstruct the administration of

---

14. To date, only five courts have discussed the application of Guideline § 3A1.3 in the form of a written opinion. *See United States v. Roberts*, 898 F.2d 1465 (10th Cir.1990) (victim held around neck at knifepoint was denied freedom of movement so as to be physically restrained); *United States v. Tholl*, 895 F.2d 1178, 1184 (7th Cir.1990) (restraint of victim during phony drug "arrest" warranted two-level increase); *United States v. Stokley*, 881 F.2d 114, 116 (4th Cir. 1989) (preventing victim from leaving room in which defendant placed pipe bomb constituted "forcible restraint"); *United States v. Meyers*, 733 F.Supp. 1307 (D.Minn.1990) (two-level enhancement for restraint of victim not appropriate because offense conduct addressed in § 3A1.3 is covered by § 2A3.4); *United States v. Bell*, 716 F.Supp. 1207, 1211 (D.Minn.1989) (offense level increase under § 3A1.3 not appropriate where "restraint is an element of the offense").

15. "Physical" means "of or pertaining to the body." *The America College Dictionary* 914 (1966). "Restrain" is defined as "1. To control or check. 2. To take away freedom or liberty of. 3. To restrict or limit." *Webster's New Collegiate Dictionary* 987 (1977). "Forcible" means "achieved by use of force." *United States v. Stokley*, 881 F.2d at 116 (quoting *Webster's Second New Riverside University Dictionary* (1984)).

16. We note that the physical restraint involved in this case was not an element of the offense, was not specifically incorporated into the base offense level, and was not listed as a specific offense characteristic, any of which would have rendered the guideline inapplicable. *See* Application Note 2 of the Commentary to Guideline § 3A1.3.

justice during the investigation or prosecution of the instant offense" is to be increased by two levels. U.S.S.G. § 3C1.1. Application Note 1(c) of the Commentary to § 3C1.1 states that "testifying untruthfully or suborning untruthful testimony concerning a material fact" provides a basis for applying the two-level adjustment.[17]

In determining whether any of the defendants' offense levels should be increased for obstructing the administration of justice, we will consider the truthfulness of their testimony about material facts.[18] The question of whether a defendant has testified untruthfully is essentially a factual determination. *United States v. Beaulieu,* 900 F.2d 1537, 1540 (10th Cir.1990) (citing *United States v. O'Meara,* 895 F.2d 1216 (8th Cir.1990)). Burlon Davis continually denied his involvement in the Nelsons' cocaine base distribution network, despite overwhelming incriminating evidence to the contrary. With regard to a confiscated briefcase that contained money used in a controlled buy of cocaine base, Davis testified that he and William Nelson, Jr., stole the briefcase from a man named "Jimmy." This testimony was contradicted by an abundance of evidence presented by the government at trial.

William Nelson, Sr., testified at trial that all the witnesses who provided unfavorable testimony were liars. He said that he acquired his money from gambling and "junking" automobiles. He also denied giving Strathman the Derringer. The elder Nelson claimed that he had never seen crack cocaine at his house on North Neconi Street. Statements from numerous witnesses, grand jury testimony, and trial testimony flatly contradict the testimony of William Nelson, Sr., and indicate that this defendant frequently sold and approved of the sale of cocaine base to many individuals.

Dana Nelson testified before the grand jury that he was aware of the drug sales at the Nelson house on North Neconi Street, and that he personally observed Harvey Curry and William Nelson, Jr., participating in drug transactions. He further testified that William Nelson, Sr., received money in exchange for supplying the drugs. Dana Nelson related similar information to a Bonner Springs, Kansas, police officer on February 7, 1989. Testifying in his defense at trial, however, this defendant contradicted himself by stating that none of the defendants were involved in drug sales.

While the court is cognizant of the fact that suspect testimony and statements are to be evaluated in a light most favorable to the defendants,[19] the court finds by a preponderance of the evidence that Daniel Nelson, Dana Nelson, and Burlon Davis testified untruthfully at trial with regard to material facts. The court is not simply relying on the general verdict of the jury or the jury's "flat rejection" of the testimony of these defendants. *See United States v. Beaulieu,* 900 F.2d 1537, 1540–41 (10th Cir. 1990). Nor are we punishing the defendants for merely denying their guilt or exercising their constitutional rights. *See* Application Note 3 of the Commentary to § 3C1.1. The testimony of these three defendants was contradicted by the trial testimony of numerous accomplice witnesses and an abundance of corroborating evidence presented by the government.

■ Diana Nelson will likewise receive a two-level enhancement. The court finds

---

**17.** Counsel for Burlon Davis objects to the court's consideration of any statements by his client to the probation officer for purposes of determining an obstruction of justice enhancement because counsel instructed the probation officer not to contact Davis. While the court will rely exclusively on this defendant's testimony at trial in applying Guideline § 3C1.1, we note that a federal probation officer is an extension of the court and not an agent of the government. In interviewing a defendant as part of the presentence investigation, the probation officer "serves as a neutral information gatherer

for the sentencing judge." *United States v. Jackson,* 886 F.2d 838, 844 (7th Cir.1989). Defendant is not entitled to counsel at a presentence interview. No Sixth Amendment right attaches. *Id.* at 845.

**18.** The court is not considering any correspondence written by these defendants in determining whether they obstructed the administration of justice.

**19.** *See* Application Note 2 of the Commentary to Guideline § 3C1.1.

by a preponderance of the evidence that she testified untruthfully to the grand jury and that she attempted to suborn untruthful testimony.[20] An indictment filed in this court charges Diana Nelson with entering into an agreement whereby Robert Nelson would falsely claim responsibility for the cocaine base in the case against her husband, William Nelson, Sr. Diana Nelson was to provide Robert Nelson with a quantity of cocaine base in exchange for his false testimony. In addition to any agreement to suborn testimony, this defendant falsely testified to the grand jury that William Nelson, Jr., and Robert Nelson, not William Nelson, Sr., sold cocaine base. She attempted to persuade Melissa Bolton to falsely testify that Robert Nelson, rather than William Nelson, Sr., was involved in the drug trafficking at the Nelsons' two houses in Bonner Springs, Kansas.

### E. Role in the Offense

#### 1. William Nelson, Sr.

Guideline § 3B1.1 permits an increase in the offense level based on a defendant's "role in the offense."[21] If the defendant was an organizer or leader of a criminal activity that involved five or more participants[22] or that was otherwise extensive, § 3B1.1(a) requires the court to add a four-level enhancement. A three-level enhancement is appropriate if the defendant was a "manager or supervisor" of the same type of activity. U.S.S.G. § 3B1.1(b).[23] The government and the probation officer urge the court to find that William Nelson, Sr., was a leader of the cocaine base distribution network in Bonner Springs, Kansas.

There are several factors that distinguish a leadership and organizational role from one of mere management or supervision.[24] These factors include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. Application Note 3 of the Commentary to § 3B1.1. There need not be evidence of every factor before a defendant is found to be a "leader or organizer." United States v. Ortiz, 878 F.2d 125, 127 (3d Cir.1989).

We have no difficulty concluding that William Nelson, Sr., was the "leader" of extensive criminal activity that involved more than five participants. Testimony before the grand jury and during trial showed that this defendant organized and led a conspiracy to distribute cocaine base from his house at 143 West Insley Street in Bonner Springs, Kansas. Numerous witnesses reported that most of the large

---

20. While this defendant will receive only a two-level enhancement for her role in the instant offense because she was subjected to coercion and duress, we believe that the coercion and duress exerted by William Nelson, Sr. did not play any role in Diana Nelson's obstruction of the administration of justice. William Nelson, Sr. was in pretrial detention at the time of his wife's grand jury testimony and attempt to suborn false testimony. There is no evidence of any threats of physical injury upon Diana Nelson or that such threats could have been carried out by her husband at the time in question.

21. See, e.g. United States v. Pierce, 893 F.2d 669, 676 (10th Cir.1990) (conspiracy to ship cocaine for distribution was "otherwise extensive").

22. A "participant" is a person who is criminally responsible for the commission of the offense, but need not have been convicted. Application Note 1 to the Commentary of Guideline section 3B1.1.

23. See, e.g. United States v. Rutter, 897 F.2d 1558 (10th Cir.1990) (recruitment of accomplice to transport drugs creates permissible inference that defendant's role was transformed from individual to supervisory); United States v. Williams, 897 F.2d 1034 (10th Cir.1990) (defendant's involvement in ongoing drug trafficking conspiracy over period of nine years made her "organizer or leader").

24. Titles such as "kingpin" or "boss" are not controlling. Application Note 3 of the Commentary to § 3B1.1. In addition, there need be "no particular formality in the ossature of a narcotics enterprise to justify invocation of section 3B1.1. Drug dealers are unlikely to make much use of position descriptions and organizational charts." United States v. Diaz–Villafane, 874 F.2d 43, 48 (1st Cir.), cert. denied, —— U.S. ——, 110 S.Ct. 177, 107 L.Ed.2d 133 (1989).

sales occurred at his Insley address, while the primary retail outlet was half a block away at 223 North Neconi Street. "Buy money" that was used to make controlled purchases at the Neconi residence was later discovered at the Insley house.

At least one participant and many "customers" testified that William Nelson, Sr., and his wife, Diana Nelson, controlled the distribution and sale of cocaine base. On numerous occasions, their approval was sought before the drugs were provided on credit or exchanged for an item. After a participant in the conspiracy received permission from William Nelson, Sr., or Diana Nelson to make a trade or sale, that person would return the money or item obtained in exchange for the cocaine base to one of these two defendants. William Nelson, Sr., also purchased a club and a house in Coffeyville, Kansas. Testimony revealed that he instructed several members of the group to sell cocaine base for him in that city. Taken together, the information presented at trial and at the evidentiary hearing shows the extensive involvement of William Nelson, Sr., in the planning, organization, and control of the conspiracy.

### 2. Diana Nelson

#### (i) Manager or Supervisor

■ The probation office recommends that the court consider Diana Nelson a manager or supervisor of a criminal activity involving five or more persons. A manager or supervisor of such activity is to receive a three-level enhancement under Guideline § 3B1.1(b).[25] Defendant denies that she was in charge of the drug operation. She states that she was present at her Insley Street residence only to care for her children. The government argues that

Diana Nelson and her husband were leaders or organizers because they controlled the distribution of crack to others and received proceeds.

While the court is fully aware that more than one person may qualify as a leader or organizer,[26] we believe that Diana Nelson played a managerial or supervisory role in the conspiracy, based on her culpability and the relative responsibility entrusted to her.[27] In order to be a supervisor, a person needs to merely "give some form of direction or supervision to someone subordinate in the criminal activity for which the sentence is given." United States v. Backas, 901 F.2d 1528, 1530 (10th Cir.1990). As noted above, this defendant and her husband controlled the sale and distribution of cocaine base. Witnesses testified that Diana Nelson supervised the sale of cocaine base in Bonner Springs when her husband was in Coffeyville. In the absence of her husband, Diana Nelson's approval was required before other participants could sell the drugs or exchange them for an item.

A witness testified that on one occasion Diana directed two individuals to a laundry cup of cocaine base "stashed" on the roof of one of the Nelsons' Bonner Spring residences. The cocaine base was hidden on the roof because this house had previously been raided by law enforcement authorities. Testimony also revealed that Diana brought large pieces of crack to her residence and "cut the crack into rocks" weighing approximately 0.2 grams each, the weight of "rocks" typically sold at the retail level. She also counted the money that sellers returned after dealing the drugs.

**25.** See, e.g. United States v. Backas, 901 F.2d 1528, 1530 (10th Cir.1990) (defendant had power of direction or supervision over doorman who let customers in drug house and screened them); United States v. Smith, 893 F.2d 1269, 1275 (11th Cir.1990) (defendant maintained position of management and supervision in that she supervised marijuana cultivation crew, received and paid for supplies of methamphetamine, distributed methamphetamine, provided armed back up during drug transactions, and helped in coverup); see also United States v. Oberski, 734 F.2d 1030, 1032 (5th Cir.1984)

(terms "managed" and "supervised" are to be interpreted according to their ordinary, lay meanings).

**26.** See Application Note 3 of Commentary to Guideline § 3B1.1.

**27.** See United States v. Herrera, 878 F.2d 997, 1001 (7th Cir.1989) (purpose of distinguishing between roles played by various criminal participants is to assess punishment based on relative responsibility; organizers and leaders are generally deemed more culpable than managers and supervisors).

In addition, the government presented evidence that this defendant used money from the final paycheck she received at a nursing home to purchase the cocaine base that started the cocaine trafficking operation. These facts clearly indicate that Diana Nelson directed and supervised subordinates who participated in the conspiracy.

### (ii) Coercion and Duress

■ Diana Nelson argues that the mitigating circumstances of coercion and duress justify a downward departure from the presumptive Guideline range, notwithstanding the jury verdict. The sentencing court may depart from the Guidelines only if it "finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C. § 3553(b); *see also* § 5K2.0; *United States v. Evidente*, 894 F.2d 1000, 1003 (8th Cir.1990).

The policy statement contained in § 5K2.12 permits the sentencing court to depart below the applicable guideline range if the defendant committed the offense because of serious coercion or duress, under circumstances not amounting to a complete defense.[28] Coercion is ordinarily sufficiently serious to warrant departure "only when it involves a threat of physical injury, substantial damage to property or similar injury resulting from the unlawful action of a third party or from a natural emergency." U.S.S.G. § 5K2.12.

We also note the fundamental differences in the definitions of coercion as applied in the language of the sentencing guidelines and in the jury charge. In order to serve as a legal excuse for Diana Nelson's criminal conduct, the jury was instructed that any alleged coercion or compulsion must have been:

> present and immediate and of such a nature as to have induced a well-founded fear in the defendant's mind of impending death or serious bodily injury to her; and there must have been no reasonable opportunity for the defendant to have avoided committing the crimes or participating in their commission without escaping the consequences of the alleged coercion or compulsion.

*See* 1 E. Devitt & C. Blackmar, *Federal Jury Practice and Instructions* § 14.16 (1977). The text of § 5K2.12, however, does not require proof of immediacy or inability to escape; nor does it limit the harm to fear of impending death or serious bodily injury. If § 5K2.12 is to be accorded any meaningful status, as the Sentencing Commission intended, we "must read it as providing a broader standard of coercion as a sentencing factor than coercion as required to prove a complete defense at trial." *United States v. Cheape*, 889 F.2d 477, 480 (3d Cir.1989).[29]

While the jury has already found beyond a reasonable doubt that Diana Nelson's actions were not coerced, we believe that a preponderance of the evidence shows that her actions were the result of coercion.[30]

---

**28.** The policy statement contained in § 5K2.12 provides in pertinent part as follows:

> If the defendant committed the offense because of serious coercion, blackmail or duress, under circumstances not amounting to a complete defense, the court may decrease the sentence below the applicable guideline range. The extent of the decrease ordinarily should depend on the reasonableness of the defendant's actions and on the extent to which the conduct would have been less harmful under the circumstances as the defendant believed them to be ...

U.S.S.G. § 5K2.12. *See also United States v. McCrary*, 887 F.2d 485, 489 (4th Cir.1989) (no evidence that co-conspirators voiced threats of physical injury, substantial damage to property,

or similar injury resulting from unlawful conduct of third parties).

**29.** The court has an obligation to construe statutes "so that effect is given to all [of their] provisions, so that no part will be inoperative or superfluous, void or insignificant ..." *United States v. Cheape*, 889 F.2d 477, 480 (3d Cir.1989) (citing 2A N. Singer, *Sutherland Statutory Construction* § 46.06 (1984)).

**30.** *See United States v. Kirk*, 894 F.2d 1162, 1164 (10th Cir.1990) (defendant has burden of establishing by preponderance of evidence applicability of mitigating factor for sentencing decrease); *McMillan v. Pennsylvania*, 477 U.S. 79, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986) (upholding constitutionality of preponderance standard at sentencing).

The defendant states that her husband, William Nelson, Sr., assaulted her on several occasions. There is some question as to whether these beatings were drug-related. Defense counsel for Diana Nelson pleads that his client was under "the spell and influence" of her husband. He adds that there is no other explanation for her actions except the "power being wielded by" William Nelson, Sr. The court is satisfied that defense counsel elicited enough testimony at trial, through cross examination of other witnesses, to prove by a preponderance of the evidence that Diana Nelson was coerced and subjected to duress by her husband's threats of physical injury.

This is an atypical case, one to which the guidelines linguistically apply but where defendant Diane Nelson's conduct significantly differs from the norm and the circumstances are sufficiently unusual to warrant departure. *See United States v. White,* 893 F.2d 276, 278 (10th Cir.1990).[31] There exists mitigating circumstances that were not adequately taken into consideration by the Sentencing Commission in formulating the Guidelines. The court finds that the Sentencing Commission did not take into consideration serious coercion and duress, and therefore instead of a three-level enhancement for Diana's role, the court is assessing only a two-level enhancement for her role in the offense.

### 3. *Dana Nelson, Damon Nelson, Davis, Curry, and Moss*

Defendants Dana Nelson, Damon Nelson, Davis, Curry, and Moss argue that the base levels of their offenses should be decreased by the court under Guideline § 3B1.2 because they played only "minor" or "minimal" roles in the drug conspiracy.

Guideline § 3B1.2 provides for a two-level reduction in the base offense level if a defendant was a minor participant in the offense, and a four-level reduction if he was a minimal participant. "Minor participant" is defined in Application Note 3 as "any participant who is less culpable than most other participants, but whose role could not be described as minimal." Application Note 3 of Commentary to § 3B1.2. Examples of "minimal participants" are persons who "played no other role in a very large drug smuggling operation than to offload part of a single marijuana shipment, or where an individual was recruited as a courier for a single smuggling transaction involving a small amount of drugs." Application Note 2 of Commentary to § 3B1.2.

The downward adjustment under § 3B1.2 is to be used infrequently. *United States v. Gillock,* 886 F.2d 220, 222 (9th Cir.1989) (per curiam). The issue of whether a defendant is a minor participant is, as the commentary points out, "heavily dependent upon the facts of the particular case." *United States v. Christman,* 894 F.2d 339, 341 (9th Cir.1990). In the instant case, an abundance of evidence indicates that the five defendants who seek this downward adjustment played active, fully culpable roles in the offenses for which they were convicted. All of these defendants possessed knowledge and understanding of the scope and structure of the drug enterprise and of the activity of others who participated in the conspiracy. We therefore find that these five defendants did not establish by a preponderance of the evidence that a downward adjustment should be made for their roles in the offense.

**31.** Departures are authorized because no set of rules, however comprehensive, can capture all features that may turn out to be important. *United States v. Pinto,* 875 F.2d 143, 145 (7th Cir.1989). The court is satisfied that the case at bar falls outside the "heartland" of typical cases embodying the conduct described in the guidelines. *See United States v. Williams,* 891 F.2d 962, 963 (1st Cir.1989); *United States v. Aguilar-Pena,* 887 F.2d 347, 349 (1st Cir.1989). While Diana Nelson's conduct falls outside the "guidelines," we believe that her behavior is captured by the "policy statement" contained in § 5K2.12. Despite the fact that our reason for departure is listed in a policy statement of the guidelines, the court is nonetheless permitted to depart from the guidelines when unusual circumstances exist and the presumptive guideline level is inappropriate. § 5K2.0. We believe that the presumptive guideline range does not adequately take into consideration the coercion and duress experienced by Diana Nelson and that these circumstances are sufficiently unusual to warrant a downward departure.

### F. Criminal History of Damon Nelson

 Damon Nelson argues that the two Wyandotte County District Court juvenile adjudications listed in his pre-sentence report should not be considered by the court as criminal convictions for the purpose of determining his criminal history, because proceedings in juvenile court are not considered criminal under Kansas law. Defendant's argument is without merit. Federal law, not state law, controls sentencing disposition in the event of convictions for federal offenses. *See Dickerson v. New Banner Institute Inc.*, 460 U.S. 103, 111–12, 103 S.Ct. 986, 991, 74 L.Ed.2d 845 (1983); *Flippins v. United States*, 808 F.2d 16, 19 (6th Cir.1987). In addition, the use of juvenile convictions in determining a defendant's criminal history has been upheld by at least three circuit courts of appeal. *See United States v. Bucaro*, 898 F.2d 368, 373 (3d Cir.1990) (rejecting due process and ex post facto challenges to use of defendant's prior adjudications of juvenile delinquency under state law in determining criminal history score); *United States v. Kirby*, 893 F.2d 867, 868 (6th Cir.1990) (per curiam) (defendant's prior juvenile convictions may be considered for sentencing purposes); *United States v. Williams*, 891 F.2d 212, 216 (9th Cir.1989) (use of juvenile conviction even though defendant had no right to jury does not violate due process).

In calculating the criminal history of Damon Nelson under the Sentencing Guidelines, the United States Probation Office added one point for a "prior sentence,"[32] as directed by § 4A1.1(c), and two additional points under § 4A1.2(d)(2)(A) for a "juvenile sentence to confinement of at least sixty days" that was served within five years of the commencement of the instant offense.[33] These juvenile convictions resulted in a subtotal criminal history score of III. Defendant participated in the instant offense less than two years after release from imprisonment on a sentence counted under §§ 4A1.1(b) and 4A1.2(d)(2)(A). As a result, two criminal history points were added pursuant to § 4A1.1(e). The total of the criminal history points is therefore five. According to the criminal history category chart, five criminal history points establishes a criminal history category of III.

 We believe that the criminal history of Damon Nelson is significantly less serious than defendants typically labeled category III. The court concludes, pursuant to § 4A1.3, that a criminal history category of III considerably over-represents the seriousness of this defendant's criminal history and the likelihood that he will commit further crimes. Accordingly, the court will depart downward to a criminal history category of II. Category II more accurately reflects the seriousness of Damon Nelson's past criminal conduct. Nelson's past criminal conduct is more consistent with defendants in category II. We note that the instant offense is this defendant's first adult conviction. In making this determination, the court also considered the youthful age at which Nelson committed the prior offenses.[34]

### G. Learning Disability of Curry

 Harvey Curry contends that his "educational disability" warrants departure from the presumptive Guideline range. He invokes the policy statement embraced in § 5K2.13, which provides in full:

**32.** After Damon Nelson was convicted of battery in October of 1984 by a Kansas juvenile court, he was ordered to attend counseling. Section 4A1.1(c) states that a conviction for which the imposition of sentence was suspended or stayed shall be counted as a "prior sentence."

**33.** Defendant was committed to the Youth Center in Topeka, Kansas on June 16, 1987 for over fourteen months after pleading guilty to a reduced charge of aggravated sexual battery.

**34.** The court is not making this downward departure on the basis of Damon Nelson's age at the time he participated in the drug conspiracy. We realize that age "is not ordinarily relevant in determining whether a sentence should be outside the guidelines." § 5H1.1 *See also United States v. Summers*, 893 F.2d 63, 69 (4th Cir. 1990) (age of 23–year–old defendant was improper basis on which to ground downward departure sentence). Irregardless of defendant's age, we believe that a downward departure is appropriate because the instant offense is his first adult criminal conviction.

If the defendant committed a non-violent offense while suffering from significantly reduced mental capacity not resulting from voluntary use of drugs or other intoxicants, a lower sentence may be warranted to reflect the extent to which reduced mental capacity *contributed* to the commission of the offense, provided that the defendant's criminal history does not indicate a need for incarceration to protect the public.

U.S.S.G. § 5K2.13 (emphasis added). The presentence report states that Curry was diagnosed as having a learning disability upon entering elementary school in 1974, and that he was retained in three grade levels for more than one year. Testing administered in 1984 revealed that defendant could perform at no higher than a third grade level in any subject area. While the evidence suggests that Curry may have some learning disability, there is absolutely no indication whatsoever that his inability to read, write, comprehend, make mathematical computations or solve problems actually contributed to his commission of the offenses of which he was convicted.

### H. *Acceptance of Responsibility*

Defendant Diana Nelson argues that she should receive a two-level reduction in her offense level pursuant to Guideline § 3E1.1, because she accepted responsibility for her criminal conduct. Defendant has the burden of proof to establish by a preponderance of evidence the applicability of any mitigating factor in question. *United States v. Urrego–Linares*, 879 F.2d 1234, 1238–39 (4th Cir.), *cert denied,* — U.S. —, 110 S.Ct. 346, 107 L.Ed.2d 334 (1989). This defendant was interviewed by a United States Probation Officer on several occasions after the guilty verdicts were returned at trial. During the first three interviews, she refused to discuss her role in the drug conspiracy and denied her guilt.

Given Nelson's lack of candor and failure to clearly demonstrate "a recognition and affirmative acceptance of personal responsibility" in a timely manner, we will reject her request for a two-level reduction in offense level. *See United States v. White,*

875 F.2d 427, 431 (4th Cir.1989) (sentencing judge may consider lack of candor and failure to voluntarily surrender in timely fashion); *United States v. Barreto,* 871 F.2d 511, 513 (5th Cir.1989) (lack of candor with probation officer considered denial of acceptance). We note that the commentary for § 3E1.1 states that a defendant who has received an enhancement under § 3C1.1 for obstructing justice ordinarily has not accepted responsibility for her conduct. *See* Application Note 3 for § 3E1.1. Diana Nelson has received such an enhancement.

The court imposes sentences different from those prescribed by the sentencing guidelines for the reasons set forth above. The court departs pursuant to Sentencing Guideline § 4A1.3 and determines that criminal history category II is to be used in the case of Damon Nelson. Defendant Diana Nelson is to be assessed only a two-level enhancement for her role as a manager or supervisor in the instant offenses. None of the defendants are to receive a two-level enhancement for their participation in the abduction and beating of Harold Sutton. All other post-trial motions, requests or objections with regard to sentencing are hereby denied.